**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JON PAUL CASTORENA, | § | |
| | § | |
| Plaintiff | § | |
| v. | § | Civil Action No. _____ |
| | § | Jury |
| CHRISTOPHER MANUEL ZAMORA, and | § | |
| THE CITY OF HOUSTON | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NATURE OF INCIDENT**

1. This is a civil action for damages sustained by Plaintiff, a citizen of Harris County, Texas against the above named Defendants, who in their intentional conduct and reckless and conscious deliberate disregard for Plaintiff's civil rights and liberty, deprived Plaintiff of his Fourth Amendment civil and constitutional rights. Plaintiff suffered property damage to his home, bodily injury, was fired from his job, has mental and emotional distress, and was wrongfully charged with the felony offense of aggravated assault of a peace officer, all by reason of an unlawful entry into his home based on a falsified warrant that lacked probable cause, and in the absence of exigent circumstances.

**PARTIES**

2. Plaintiff, Jon Paul Castorena, is an individual that is a citizen of the State of Texas.

3. Defendant, Christopher Manuel Zamora ("Zamora") is an officer of the Houston Police Department, is being sued in his individual and official capacity, and may be served with process at 1200 Travis St., Houston, Texas 77002.

1

4. At all times material herein Defendant Zamora was acting in his official and individual capacity and within the course and scope of his employment and also acted in concert in violating Plaintiff's civil rights protected by the Fourth Amendment of the United States Constitution.

5. Defendant, City of Houston is a political subdivision of the State of Texas. Service of citation upon the City of Houston may be made via the Mayor of Houston Anise Parker, 900 Bagby St., 2nd Floor, Houston, Texas 77002.

6. At all times material herein Defendant City of Houston was a public body responsible for the conduct of employees and liable for their police officers' conduct and violations of 42 USC Section 1983, performed in the course of official capacity; and Defendant(s) were acting within the scope of their employment as police officers for the City of Houston.

### JURISDICTION & VENUE

7. The jurisdiction of this Court is invoked pursuant to the provisions of 28 U.S.C. §§1331 and 1343. In addition, the Court has jurisdiction over the lawsuit because the suit arises under the Fourth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. §§1983 and 1988.

8. Venue is proper in the Southern District under 28 U.S.C. §1391(b)(1) because Defendant Zamora resides in this district. Venue is also proper in the Southern District under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

### GOVERNMENTAL LIABILITY

9. Plaintiff asserts that at all times material herein, Defendant City of Houston has been made aware that its officer(s) had previously been involved with violation of Plaintiff's civil rights and have, with deliberate indifference, failed to inform or train employees in an effort to

avoid future violations of Plaintiff's civil rights.  The failure of Defendant City of Houston to correct police misconduct or train its officer(s) has established a pattern of defacto policy shown by Defendant City of Houston's failure to admonish, correct or train its errant officer(s).

10. At all times material herein, Defendant Zamora was employed as a Houston Police Officer for Defendant City of Houston.

### FACTUAL BACKGROUND

11. Plaintiff, a consistent donor of such charities as the "100 Club" in support of members of Houston Police and Fire Departments, Houston Police Department's "Fallen Heroes," "The Wounded Warrior Project" in support of American troops, the Komen Foundation's "Race for the Cure," and "Walk for the Cure," to name a few, is a resident and homeowner in the vibrant Montrose area of Houston, Texas.  Plaintiff owns a well-kept four-story townhouse, where he lives with his pet dog "Rocco."  An avid pet owner, Plaintiff is an active helper of P.A.W.S., Houston SPCA, and founded FindMyPup.com in an effort to help reunite lost dogs with their owners.

12. On Sunday, April 28, 2013, Plaintiff fell asleep on his second floor couch, his usual place of sleep at his residence at 1220 W. Pierce St., Houston, Texas 77019.  For over decade, Plaintiff has suffered from Meniere's disease in his right ear, which caused severe hearing loss, and constant ringing.  In order to fall asleep, Plaintiff uses a method called "biofeedback," which is the practice of letting the ringing in the ear lull a person to sleep, accompanied by some background noise in the same ear, such as a television.  The method also requires Plaintiff to sleep with his "good" ear (left ear) down.  While "biofeedback" allows Plaintiff to fall asleep much easier, it also makes waking up much more difficult.

3

13. Just before falling asleep at 11:00 p.m., Plaintiff used his iPad to set his alarm clock to wake him up in the morning for work. While Plaintiff believed the alarm would sound off only in the interior area of his home (Zone-1) the following morning at 6:50 a.m., he mistakenly hit an icon on his iPad's audio system application which immediately activated Zone-2 (his fourth floor terrace) to play the song "Girl From the North Country," a duo by Bob Dylan and Johnny Cash, which had been selected as the morning alarm song. The song began to play on repeat through the two speakers on the fourth floor terrace and well out of the earshot of Plaintiff who was sound asleep on his second floor couch.

14. As the music continued to play on repeat since the time Plaintiff accidentally activated the alarm, Plaintiff's next-door neighbor Steven Butera, heard the music coming from the fourth floor terrace and walked over to Plaintiff's house around 12:45 a.m. in an effort to make it stop. After knocking on Plaintiff's front door, ringing his doorbell, and getting no answer, Butera returned to his home and called the non-emergency number for Houston Police Department to report a noise disturbance. By 12:50 a.m., Butera saw an officer arrive and approach Plaintiff's door. Butera heard the officer knock on the door in a normal manner for a few minutes, but then heard the knocks getting louder and louder, as if the officer was banging on Plaintiff's door with a flashlight or club.

15. At approximately 1:00 a.m. on April 29th, Plaintiff suddenly woke up to extremely loud and frantic barking of his dog Rocco, who was also eagerly nudging at his neck. Simultaneously, Plaintiff heard violent banging at his front door and the jiggling of his door handle, causing him to think someone was breaking into his home.

16. A concealed handgun license holder, Plaintiff grabbed his firearm from its keeping place (an end table to his couch), then slowly and carefully made his way to the top of the stairs

4

and peered down to the bottom floor entry doors from a crouched position on the second floor at the top of the stair case, keeping the gun in his hand and at his right hip, with the dog kept at bay with his left hand firmly gripping the collar.  Plaintiff was crouching in complete darkness at about a 12ft. elevation point looking down, trying to make out a figure of a person through the double-paned blurred safety glass on the front doors.  The entry doors are French doors, solid wood with highly blurred double-paned decorative safety glass; nearly impossible to clearly see through in order to make out an image when standing only a few feet from the door, even in broad daylight.

17.  As the banging of the door, jiggling of the handle, and vicious dog barking continued, Plaintiff yelled out, "Who are you and what do you want" several times.  Through the door, the only thing Plaintiff could make out was a figure yelling in a male voice, "Open this fucking door now!"  Likewise, the person standing outside in the porch light could not see into the dark house through the frosted glass.

18.  Tremendously frightened at that point, Plaintiff informed the person whom he sincerely believed to be an intruder that would cause him harm, that he was armed, to please stop banging and back away from my door.  As the banging and yelling continued, Plaintiff racked his firearm with the barrel of the firearm pointing downward to his right for safety.  Immediately, Plaintiff noticed the figure from the blurred glass backed away.

19.  Still being on the second floor and not having gone down to the first floor in fear of his safety, Plaintiff stood from his crouched position and made his way to a French door leading to his second floor balcony which overlooks the front of his house in an effort to see if he could make out the situation through the blinds.  At that point, Plaintiff saw a police car on the opposite side of the street in front of his house.  Because of all the confusion and the erratic behavior from

the person at the door, Plaintiff immediately thought the police were chasing a suspect who was just trying to break into his house to evade the pursuing officer(s).

20. Curious as to the status of the figure that backed away from his front door, and still hearing a man yelling, Plaintiff cracked the second floor balcony door to get a better idea of the situation and was finally able to make out the figure's statement of, **"This is HPD, turn that fucking music off and open your fucking door right now!"**  At that point, Plaintiff still could not see the person who was yelling, or hear any music playing.  While Plaintiff was utterly puzzled by the person's statement and aggressive behavior, Plaintiff was even more puzzled why the person was targeting him.  Throughout this time, Plaintiff's dog was viscously barking at the ongoing commotion, as Plaintiff continued to hold him at bay with his collar.

21. The person claiming to be "HPD" was Defendant Christopher Zamora, but his behavior was so far removed from what Plaintiff considered normal, Plaintiff had a difficult time believing the person was an officer.  Nevertheless, eager to remedy the entire situation, Plaintiff took a leap of faith and decided to put the gun he was still holding in his right hand down. Plaintiff then very carefully stepped out onto his second story balcony in a low crouched position to see the person by carefully peering over the ledge, putting his right hand on the railing, with his left hand firmly grasping his dog's collar in an effort to prevent his dog from getting onto the balcony.

22. As soon as Plaintiff looked over the balcony, Defendant Zamora immediately shined a light into Plaintiff's face, making it impossible for Plaintiff to make out who the figure was. Defendant Zamora aggressively yelled again, **"Turn the fucking music off, come down here and open this fucking door!"**  Defendant Zamora then asked Plaintiff what was in his left hand, which was not in the Defendant Zamora's view because Plaintiff was crouched on the balcony

with only his right hand visible. Plaintiff promptly informed Defendant Zamora he was holding his dog back, and that he didn't hear any music.

23. Plaintiff slowly stepped back inside never turning his back to Defendant Zamora, walking backward into his house to try and make sense of the situation. It was at that point that Plaintiff realized the music to which the Defendant was referring could only be coming from the Zone-2 fourth floor terrace, as no sound was emanating from the interior of the house. Plaintiff immediately scrambled around to check his iPad audio controls, realized Zone-2 was indeed playing a song, then immediately shut down the entire system by pressing the "OFF" button on the system's main amplifier to quell any future disturbance of the system.

24. After shutting down the system, Plaintiff went back to the second story balcony to inform Defendant Zamora the music had been shut off and apologize for the misunderstanding. Defendant Zamora did not relent. In fact, he interrupted Plaintiff and continued to yell profanity after profanity. Despite the fact the entire reason Defendant Zamora was called to Plaintiff's home was now moot, Defendant Zamora continued to yell, shine the light, and point his weapon at the Plaintiff.

25. Completely frightened after being abruptly awoken just moments before, and having Defendant Zamora point his weapon at him, blind him with his flashlight, and demand he get outside for some unknown reason, Plaintiff was terrified to go outside, and called 9-1-1 Emergency. Still on the second floor, Plaintiff explained to the 9-1-1 Emergency Attendant that he thought someone had been trying to break into his house, that he now realized it was a police officer, that he realized the fourth floor terrace speakers were playing by mistake, that he had shut down the music, but that the officer was being far too threatening for him to go downstairs or go outside.

26. The 9-1-1 Emergency Attendant then asked Plaintiff to hold for a call transfer.  A new person came on the line and identified himself as an "HPD Sergeant."  The sergeant explained to Plaintiff he did truly believe the entire situation was a misunderstanding, that he was going to look into the situation with the officer, and that he would get back in touch with Plaintiff by phone, and validated the correct phone number to call back.

27. At that point, Plaintiff believed the incident was on its way to being cleared up and over with.  Plaintiff waited for a call back for 30 minutes while standing in his kitchen, but nothing came.  Although Plaintiff noticed a light shining through his second floor balcony windows, because the sergeant gave Plaintiff strict instruction that he would call him back, Plaintiff stayed inside.  Overcome with anxiety and nerves, Plaintiff became physically ill, and went upstairs to the third floor restroom and vomited several times.  Plaintiff immediately self medicated with generic nausea medicine called "Meclizine" and nerve medicine called "Klonopin," which is prescribed to Plaintiff for his ear problems.

28. With his pulse racing, Plaintiff was in desperate fear of having a heart attack.  He sat on the bathroom tiles for another half hour clutching his phone waiting for the Sergeant to call him back, but no call came.  Physically exhausted, Plaintiff fell asleep on the third floor.

29. At 4:27 a.m., Plaintiff woke up to his phone ringing. The man on the other end of the line (the sergeant from earlier) informed Plaintiff that he still believed the situation was a misunderstanding, but that Plaintiff would need to come outside and that he would be arrested, and the situation would have to be settled in court.  Despite Plaintiff's pleading for an explanation of why he would be arrested, the sergeant would not clarify the reason for the arrest. Plaintiff was now even more confused, and then moved from the third floor to the second floor in order to see who was outside.

30. As Plaintiff peered out his second floor balcony window, he could see there were now at least five or six police cars with officers aiming shotguns and rifles at his house windows, media personnel, two SWAT vehicles, and teams of men dressed in military-style uniforms aiming assault weapons at he and his house. Plaintiff went to the second-story balcony once again, pleading with the officers to put their weapons down. At this point, Plaintiff was utterly horrified, and thought he was going to be killed over a *noise disturbance*.

31. Plaintiff again explained the music on the fourth floor had been turned off, that it had gone off by mistake, that he had been sleeping, and that he was alone. The sergeant agreed with Plaintiff, but explained he would still have to be arrested and the situation would have to be addressed in a court of law. Realizing the sergeant on the phone could not help the situation; Plaintiff requested a little time to call his family to inform them of his dire situation. The sergeant obliged.

32. After successfully reaching his family, Plaintiff called the sergeant back at 5:31 a.m. and agreed that he would come down unarmed and peacefully. While ending his conversation with the sergeant, Plaintiff received a phone call by call-waiting from a man who identified himself as the "Sergeant of the SWAT Team," and told Plaintiff that he had to come outside or they would tear down his house to get him. In fact, the Sergeant of the SWAT Team informed Plaintiff he had exactly ten minutes to come outside, to which Plaintiff agreed to do so.

33. Plaintiff immediately started to prepare to exit and began making his way to the first floor for a pair of shoes, and then the door. However, as Plaintiff started down the steps to the first floor, there was an enormous blast as one of the SWAT vehicles rammed through Plaintiff's front doors, bursting one half of the French Doors in an explosion. Plaintiff was violently knocked down onto his wooden staircase by the blast, and shattered glass and wood was thrown

all about the bottom floor foyer and onto Plaintiff.  Lying on his staircase, Plaintiff then heard what sounded like shotgun blasts coming from the west side of his house.  As it turned out, it was a SWAT Team vehicle shooting a cannon at the house.

34.  In a total state of panic as if a part of a twisted nightmare, Plaintiff believed he would surely die. As Plaintiff made his way to his patio to retrieve his dog, he was shot in the stomach with a non-lethal projectile that produced smoke.  Although struck, Plaintiff was able to retrieve his dog and place him into his kennel.

35.  Plaintiff then slowly walked outside through the blasted door with his hands in the air, yelling, "Please don't shoot! I am unarmed!" and asked where he was supposed to go.  As Plaintiff made his way to the center of the street in front of his house, Plaintiff noticed officers playing on their phones, and smoking cigarettes.  Still being berated with profanities, Plaintiff was told to "Put your fucking face on the concrete rich boy."  Plaintiff got down on his knees and lay down with his face on the street as requested, and put his arms behind my back.  An officer slammed his knee into Plaintiff's back, and stomped Plaintiff's right foot.  And despite the fact that Plaintiff already had his face on the ground and his hands behind his back, the officer grabbed Plaintiff's right arm and popped it out of its socket.  After Plaintiff was detained at the scene long enough for the morning shift to arrive, he was finally transported to jail.

36.  Plaintiff was charged with felony aggravated assault of a police officer with a deadly weapon.  In support of the charge, Defendant Zamora stated:

> "[o]n April 29, 2013, he went to a residence at 1220 West Pierce in Houston, Harris County, Texas in response to a loud music disturbance.  [Zamora] states that he went to the door in full police uniform and observed [Plaintiff], a person he identified by viewing his driver's license photograph on a computer screen, with a gun in his hand.   [Zamora] states that he observed [Plaintiff] point the weapon at [Zamora] while [Plaintiff] was standing in his house and [Zamora] was standing outside [Plaintiff's] house."

37.   Being that it is impossible for a person to see through Plaintiff's front door at any time of the day, especially at night, due to the frosted security glass, Defendant Zamora's statement was false, and the Grand Jury ultimately failed to find a bill of indictment.

38.  Although Plaintiff was not convicted for the felony charge of aggravated assault of a police officer, the damage to Plaintiff's life had already been done.  Not only was his custom front door demolished, his house marked with indentions from cannon fire, and his personal belongings and furniture scattered about his home, but Plaintiff was damaged mentally as well.

39.  Having been violently awaken in the middle of the night, assaulted by dozens of officers, including the SWAT Team having his house pummeled, and all over a noise disturbance, Plaintiff was treated for mental distress and diagnosed with post-traumatic stress disorder. To make matters even worse, Plaintiff was fired from his job of six years on May 7, 2013 for being charged with felony assault.

40.  In perhaps a final sign of the total disrespect of Plaintiff's constitutional rights, while rummaging through Plaintiff's home, officers removed the wrong gun from the house.  That is, of the two handguns in Plaintiff's home, one being the handgun he grabbed on the night of the incident and left in plain view on the second floor, and the other being one securely stored and out of sight on the third floor; officers grabbed the handgun secured on the third floor- a completely different type of handgun from the one Plaintiff grabbed the night of the incodent.

**VIOLATION OF CONSTITUTIONAL RIGHTS UNDER THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION &  42 U.S.C. SECTIONS 1983 AND 1988
UNLAWFUL ENTRY INTO HOME WITH FALSIFIED WARRANT IN THE ABSENCE OF EXIGENT CIRCUMSTANCES & UNLAWFUL SEIZURE OF PERSON**

41.  Plaintiff incorporates the above numbered paragraphs as though set forth fully herein.

42.  Defendant Zamora provided false information in order to obtain a warrant for the arrest of Plaintiff, and caused *dozens* of members of Defendant City of Houston's law enforcement

agencies, including Houston Police Department's SWAT Team, to swarm Plaintiff's home, fire a cannon at the walls of Plaintiff's home, break down Plaintiff's front door, wrongfully arrest Plaintiff, and haul him to jail; all over a Bob Dylan/Johnny Cash song that was playing on repeat on Plaintiff's fourth floor balcony as Plaintiff peacefully slept in the comfort of his home.

43.   The force used in addressing Plaintiff, and the manner in which Plaintiff was seized, arrested, and detained was unreasonable, unnecessary, excessive, and violated Plaintiff's clearly established rights under the U.S. Constitution, and even continued after Plaintiff shut off the "noise disturbance."

44.   All of the acts described above occurred in plain view of Plaintiff's neighbors and members of the media.

45.   As a result of Defendants' conduct, Plaintiff suffered economic damages for the following: (1) repair of the front door, exterior of the home, and clean up of the house; (2) loss of his job and income; (3) medical/health related treatment; and (4) costs for bail and legal services necessary to address the groundless criminal allegation of assault of a peace officer.

46.   Further, Plaintiff suffered noneconomic damages as a result of Defendants' conduct causing Plaintiff: (1) fear of being shot to death; (2) damage to his personal and professional reputation as a peaceful law abiding citizen; (3) extreme humiliation and embarrassment; (4) loss of privacy of person and home; (5) loss of safety and security in having his home and personal privacy invaded; (6) being taken to jail; and (7) undergoing a groundless criminal proceeding for felony assault of a peace officer.

47.   The conduct of Defendants was deliberately indifferent to the constitutional rights accorded to citizens, in falsifying a warrant used to justify entry into Plaintiff's home and seizure and arrest of his person.   Such conduct was willful, deliberate, and with reckless disregard for

Plaintiff's clearly established constitutional rights, and Plaintiff should be awarded punitive damages against Defendants in an amount to be determined at trial.

### ATTORNEY FEES

48.  Plaintiff is entitled to an award of attorney fees and costs under 42 U.S.C. §1988(b).

### PRESERVATION OF EVIDENCE

49. Plaintiff hereby requests and demands that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the transactions made the basis of this lawsuit, or damages resulting therefrom, including statements, photographs, videotapes, surveillance tapes, audiotapes, business records, partnership or corporate records, audits, regulatory records or communications, contracts, leases, bills, estimates, invoices, checks, correspondence, investigation reports, policies, protocols, personal information, memoranda, facsimiles, email, cellular telephone records, voice mail, text messages, witness statements, and any electronic image or information related to the referenced transactions or any damages resulting therefrom. Failure to maintain such items will constitute "spoliation" of the evidence.

### CONDITIONS PRECEDENT

50.  All conditions precedent to Plaintiff's claim have been performed or have occurred.

### JURY DEMAND

51.  Plaintiff hereby requests a trial by jury.

### PRAYER FOR RELIEF

52.  As a direct and proximate result of Defendants' violations of Plaintiff's constitutional rights under the Fourth Amendment of the U.S. Constitution and 42 U.S.C. 1983 and 1988, Plaintiff prays for the following relief:

a.  Economic damages for the loss of his job, income, and earning capacity in an amount to be determined at trial;

b.  Economic damages for damage done to his property and residence in an amount to be determined at trial;

c.  Economic damages for Plaintiff's incurred legal defense costs in an amount to be determined at trial;

d.  Economic damages for medical expenses in the past and future in an amount to be determined at trial;

e.  Noneconomic damages for Plaintiff's post-traumatic stress disorder, depression, emotional distress, fear, injury to reputation, and humiliation and embarrassment in an amount to be determined at trial;

f.  Punitive damages in an amount to be determined at trial against the officer(s) individually, in an amount to be determined at trial;

g.  Reasonable costs and attorney fees incurred as a result of this cause.

h.  Prejudgment and post-judgment interest;

i.  All remedies provided by Sec. 1983 and 1988; and

j.  All other relief the Court deems appropriate.

Respectfully submitted,

**TY A. GIBSON & ASSOCIATES, P.C.**


By: /s/ *Brett Hill*
**Ty A. Gibson**
ty@taglawpc.com
Texas Bar No. 24083069
**Brett Hill (Attorney in Charge)**
brett@taglawpc.com
Texas Bar No. 24072776
Southern District Bar. No. 2130125
The Kirby Mansion
2000 Smith Street
Houston, Texas 77002
(713) 659-4000 (Telephone)
(713) 752-2002 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**